Nathson Fields v. City of Chicago Good morning, everyone, and welcome. The first case of the day is Nathan Fields v. City of Chicago, Appeal 1730-79, 1731-25, and 1812-07. It's your intention that the defendant did not introduce evidence in the 2014 trial that Hawkins was receiving no consideration for his testimony and would remain in prison until 2016 to 2028 I'm trying to figure and argue that therefore he should be believed? At that trial we made a good faith argument based on the sheer fact that parole is never entirely certain there was a representation from AUSA Hogan that he believed that because of this is a letter that was provided to Mr. Fields as well that though Hawkins was scheduled for parole in 2016 they did not believe that he would be able to satisfy the mandatory parole criteria because of the extensive criminal record Well that's why the existence of a secret deal makes a difference If there was one that might be but there certainly was not That's the contested point There is no evidence that's record-issue I think your stronger argument is on the character of this evidence which is that it's merely impeaching it's also cumulative since there was ample impeachment evidence but rather than fight about when this was discovered and whether there was or wasn't a secret deal all of that is disputed let's talk about whether the character of this evidence the nature of this evidence qualifies as a basis for a grant of a new trial in a civil case I'm more than glad to turn to that now granting a new trial for impeachment evidence cannot stand the Supreme Court's decision in Southern Southern is quite clear it recognizes the rule the newly discovered evidence which goes to impeach the character of a witness examined in the original suit is not sufficient to warrant a new trial and countless cases consistent with that say the exact same and there is absolutely no dispute here that this was impeachment evidence Mr. Field's motion for a new trial repeatedly characterized Hawkins' release as that's an R-774 at 19 and the district court granted a new trial specifically to see if that additional impeachment might convince a new jury that Hawkins' testimony should be disregarded that's at age 20 to 21 that pretty well resolves this case right there the district judge seemed to think that it makes a difference whether the impeachment evidence impeachment of the witness Hawkins who was a key witness no doubt the judge seemed to think it makes a difference whether the impeachment evidence newly discovered impeachment evidence is very strong or very weak that seems to be referred to as a bonanza and it seemed to wrap that in with a statement that it's not merely impeaching there's a number of problems with that the phrase merely impeaching means the fact that evidence might have an impeachment quality to it doesn't disqualify if it is actually can serve a very legitimate non-impeachment purpose if you have very strong evidence that something happened and you're offering it for that purpose and it might also if it contradicts a witness' testimony for instance that would by its nature also have some impeachment value but that doesn't disqualify it but this here was purely impeachment evidence and also to the extent the district court thought the strength of the evidence could circumvent this rule that runs right back into southern What do we do with the Taglia case on that point? To the extent Taglia discussed Rule 60B2 that discussion was dicta first and foremost Taglia was a criminal case in which Rule 60 just simply does not apply that's governed by Federal Rule of Criminal Procedure 33 and reflecting some differences there the Rule of Criminal Procedure 33 isn't phrased in the same way it seems to be written in a broader nature and Taglia actually relied on that aspect of Rule 33 and as it happens on top of that Taglia was talking about a truly extraordinary case where you have evidence where you have one witness and you have impeachment evidence that comes forward that makes that witness impossible to believe we don't have that here we have run-of-the-mill impeachment evidence garden variety impeachment evidence in fact Mr. Hawkins was extensively impeached at this trial we addressed that on pages 10 through it was so much impeachment we had to address that in bullet points on pages 10 through 12 of our brief You know you raised a number of evidentiary challenges but in a trial that lasted a month long how can we conclude that those alleged errors had a substantial influence over the jury and affected the outcome of the case for instance weren't the defendants able to present substantial testimony as to the structure the nature of the arrogance that would implicate Mr. Fields in the bad conduct of the gang why should the exclusion of additional evidence as to any involvement of his in the arrogance call the entire trial into question it's really a fundamental question I apologize your honor that was not my brief that was Mr. Noland and Mr. Colvin I am aware that that is so I do not wish to try to speak for them I apologize for any inconvenience of this court so I just want to turn back very quickly I think that this court can resolve this case on Southern and the long standing rule that it recognized a rule that was specifically incorporated by the drafters of Rule 60b-2 when Rule 60b-2 was enacted and that also reflected historical practice going back to the first Congress the very first new trial statute signed by George Washington also incorporated prior practice that is the Judiciary Act of 1789 and we believe that's enough that Southern controls it sets forth the standard it says that even material evidence that impeaches a material witness is not enough and we believe this court can and should reverse on that ground just to address Judge Sykes your concerns about a secret deal and whether the record reveals one the record actually goes the other way and to the extent that you have concerns I would refer this court to first of all to the record 770-3 that's the 2013 restructured deal that states that Mr. Hawkins would receive makes his federal time coterminous then I refer you to 770-4 which is the deposition where it was reiterated face to face to Mr. Fields and his counsel I don't think the dispute is over whether the state time would be coterminous with the federal time but the dispute is when he would be released from federal prison and whether there was an agreement to provide support for his release on his MR date that the standards had been met that he's not likely to re-attend and that he's been a model prisoner etc. So to the extent that you're referring to the support that was provided that Mr. Hawkins deals with the United States government the plea agreements that have been in existence for several years specifically require that the federal government that the prosecutors provide support when he's up for parole But the officers? And on top of that this is at R799 Act 12 paragraph 3 this is the undisputed affidavit of AUSA Hogan which recounts that O'Callaghan and Brannigan testified numerous times in the El Rukin trials that they had agreed to write to advise any judge or parole body of Hawkins' cooperation and it was only when Mr. Hawkins' attorney I believe it was his attorney when Mr. Hawkins' attorney reached out to them to follow up on that commitment which was no secret That was a global agreement in writing with all the El Rukins The defendants that had been given cooperation agreements? I can't speak to that I can speak to this is a Mr. Hawkins so I can only speak to him and that this was no secret this was testified to in open court that's kind of the opposite of a secret and there's been no dispute that that was there's no dispute that that was said at these trials that they had agreed and the I'm not sure how it could be possibly characterized as a secret promise of cooperation I'm agreeing those trials have seen I feel like I'm beating a dead horse but it's very bothersome because in the 2014 trial the defendants presented testimony from Hawkins and another witness that Hawkins was receiving no consideration for his testimony and he'd remain in prison until perhaps 2028 that was again referenced in the defendants closing argument arguing it as a basis to believe Hawkins because there was no consideration provided by the city of Chicago or detectives for this testimony there was a 2013 deal which again if you look at 770-4 the ASA section explained that that 2013 deal was to correct a misunderstanding by Hawkins that was expressed at a previous trial Mr. Hawkins was under the erroneous belief that if he were released from federal prison at a particular time that he would be spending 11 more years in state prison and the state that they made quite clear that was not their intent that their intent was to make those coterminous and instead of giving dates the way it worked out was to give particular amounts of time to try to line them up but instead of locking into that just added this proviso that the intent is that you serve no more time than what you serve under federal sentence that was not consideration for this testimony at trial that was to rectify a misunderstanding and Mr. Fields had the opportunity to cross examine on this point if he thought there was something going on that standard cross examination at trial why did this deal come up why was this deal made in 2013 why did the state say that they're not going to have you serve any more time there was no consideration for this trial there was a deal that was trying to rectify a misunderstanding by Mr. Hawkins that he would have to spend a lot more time in jail than he would and Mr. Hawkins specifically at this trial said I think I'm getting out in 2016 if nothing don't happen and that's exact the district court even recognized that the parole was that thing that happened and that simply does not show a secret deal does not show consideration doesn't show misrepresentation it shows that at most ordinary operation of the two-thirds parole system that was moved from 2016 which had been predicted since 1999 that he'd be eligible in 2016 and was moved to 2014 because of as is undisputed here there was a correction of an error in not calculating all of Hawkins on jail time as one would expect because he had so many so many various sentences and it was a RICO charge and it's very complicated in that sense but there was absolutely nothing in this release in 2014 that shows that there was consideration for his testimony at this trial and moreover just finally the issue of diligence the district court held us to held the city of Chicago to show a lack of diligence again that's just contrary to the law that plus Southern we believe is enough to reverse the new trial order Mr. Fields had in his possession the deals he had the deposition testimony he could have easily obtained he had in his possession the parole documents that were attached to said Hawkins was projected for release in 2016 how that was how anyone could show diligence there in standing silently by and claim that he expected that Hawkins would not be released until 2027 has never been explained the district court didn't explain it and Mr. Fields has never explained how he showed diligence in the face of all this evidence I see my time is nearly up thank you morning my name is Daniel I represent Joseph Murphy speaking on behalf of the individual officers brief may I please the court to immediately address the question about the El Rupins in general that that's not that we think that this is our point the plaintiffs are making that argument the crucial evidence that was barred relates to Mr. Fields himself not the El Rupins in general Mr. Fields was allowed to distance himself from the El Rupin criminal activity because of all of these rulings that the district court made barring this evidence and that is exactly what plaintiff argued in closing and told the jury throughout the trial that was a central theme and I'll to crystallize that I'll give you an example in the rebuttal close at page 5542 counsel for plaintiff stated as follows he took a job as a building manager and that's what he was period period Nate Fields was not an enforcer Nate Fields was not an assassin Nate Fields was not involved in the sale of narcotics it was a building manager that's the only credible evidence you've heard this trial because he told you with his own mouth and he's telling you the truth and they have no evidence to suggest otherwise but of course there was testimony by other building managers who talked about some of the responsibilities like making sure there were drugs etc etc that would sully anyone but that's exactly why it was unfair your honor because there was testimony that Mr. Fields was a building manager but none that he himself was a building manager in that type of activity the cumulative evidence of the error that was of the evidence that was barred presents an entirely skewed picture of Mr. Fields and his entire case Mr. Fields was allowed to tell the jury he was not an El Rukn killer when the evidence showed that in fact he was a convicted murderer for the El Rukn related Watkins killing. Mr. Fields was allowed to falsely tell the jury over 39 times the only thing he did for the El Rukns was to be a building manager yet he was out stalking Tradesse Murray with a machine gun just weeks before our arrest in this case Mr. Fields was allowed because of these rulings to tell the jury that he didn't associate with the El Rukn cooperators like Hawkins and Clay and Keyes when his prison visitor list and other records easily refuted that claim Mr. Fields also told the jury that regarding the ruling is the names on the prison log that were in a different handwriting than that for Fields relative you know the argument has been that Fields himself approved the additional names but was that argued to the district court before or during the trial? It absolutely was your honor. Can you provide a record site? I mean you don't have to do it this minute but send it or yes your honor thank you there is a site I argued it myself Mr. Fields along those lines also argued to the jury that Mr. Murphy and Mr. O'Callaghan framed him for the Smith-Hickman murders with two guys from Evanston who we hardly knew when one of those guys from Evanston had went to visit him in prison before our murders but that evidence was barred too and Mr. Fields even falsely told the jury that he knew absolutely nothing about the bribe when the wiretap evidence proved he was told about the bribe and that it was for his benefit. You mean the wiretap evidence that was not permitted? Exactly judge the wiretap evidence that had been permitted in Judge Maloney's trial this was the exact same evidence the same translations the same transcriptions and we had the same El Rukin interpreter who was going to interpret the code which captured Jeff Ford stating make sure you tell Mr. Fields about the bribe make sure the bribe is for all of their benefit including Mr. Fields make sure that you pass a note to Mr. Fields so that he is aware of the bribe and that evidence was admissible in all of the other El Rukin trials in the 90s the first time it was ever barred and one final point I would make with the time I have now is that we have two comparators to compare the evidence that was in the 2014 certificate of innocence proceeding and the 2014 trial. In the 2014 COI all of the evidence was introduced to refuse the claim that he was a peaceful building manager and Judge Beeble found in favor of that there was no proof of innocence and that he was complicit in the bribe and then in the 2014 trial the murder conviction and the Tradesc Murray stalking incident. Let me just quickly tell you my problem with that the wiretap robbery evidence would have revealed that Knox was telling Fort that Hawkins reported that Fields was informed of the bribe. So my problem would be how can it be an abuse of discretion to exclude evidence with so many layers of hearsay which is relevant to establish Mr. Fields knowledge of the bribe only if it's accepted for its truth. Because just like in all the other El Rukin trials Mr. Hawkins was not the only conspirator in the bribe by virtue of the other evidence as well as the wiretaps themselves which can be utilized to rely upon that and that corroborates Mr. Hawkins testimony that he told Mr. Fields about the bribe then the wiretaps show that in fact what Mr. Hawkins is saying is true because it was reported back to the leader of the El Rukins that that had happened. Your Honor, thank you. Good morning, Your Honor. Shelly Cullin on behalf of David O'Farrill here. There is scant testimony that is more perniciously unduly prejudicial than unexamined hearsay from a central witness in the case that provides the sole direct evidence on most inflammatory allegations against the defendant. Here the district court admitted such statements in the form of affidavits drafted by the plaintiff's investigator obtained ex parte from Gerald Morris, the central witness in the case against David O'Callaghan who through these affidavits provides the sole evidence that Mr. O'Callaghan allegedly fabricated Morris's critical eyewitness testimony against Fields, that Mr. O'Callaghan repeatedly forced Morris to perjure himself against Fields in multiple trials through threats, intimidation, and forms of bribery, and that Morris at the time of these civil trials still lived in fear of Mr. O'Callaghan. The district court barred Mr. O'Callaghan's counsel from deposing Mr. Morris about these statements, from interviewing Mr. Morris about them, and from even talking to him after they were executed. While evidentiary rulings rarely form the basis of a reversal, if they're improperly admitted and they influence the jury, it should. Here where plaintiff's counsel forcefully and repeatedly cited Morris's false hearsay statements as proof positive of Mr. O'Callaghan's outrageous conduct, it can be said without fear of hyperbole that these unduly prejudicial and highly inflammatory hearsay statements were not only the nail in Mr. O'Callaghan's coffin, they were all the nails in the coffin as well. And to the court's point that it made about layers of hearsay, think about this. This is a man who recanted these same type of affidavits in the past when he was forced to depose, when he was forced to actually save them lives. He never stuck with them, but that this jury was given these affidavits as though he was sitting right there. There was no way to cross-examine them, no way to challenge that evidence at all. It went in whole, and uncoincidentally, it went in whole in the 2014 case as well, and Mr. O'Callaghan was the only one found liable. This was highly, highly inflammatory and prejudicial evidence, and despite the month-long trial judge, this one stood out like a glaring bell ringer, and that bell could never be unrung. Thank you, Your Honor. I think my time is up. You actually... thank you. I actually did it. Usually that's only enough time to clear your throat, but I worked hard. Thank you, Your Honor. I won't say it's a first, but close to it. May it please the court. My name is John Loewe, and I represent Macy's. This is obviously an extremely important case. The truth-seeking function of the judicial system depends on witnesses who aren't making deals with parties. When you give a testimony and you disclose it, that corrupts the whole thing, and if a court is to condone that and not have a problem with that, then everything would go out the window with the justice system, and that's exactly what happened here. There was a deal to exchange testimony for benefits, and that's totally, totally unacceptable. In a civil case, there's no such thing as free bargaining. You can't let people out of prison in exchange for testimony, and if you're going to do that, you certainly have to disclose to the other side that the witness is not disinterested. And Judge Cannelli, the only interesting finding here is Judge Cannelli said, you know, nobody wrote a confession that I'm making a secret deal, but I look at these circumstances, and I think that there was consideration provided for that testimony, and you didn't disclose it. There was a deal with witnesses. That's the judge's finding. The only question for your honors is, is that plain error? Is that an abuse of discretion? Did Judge Cannelli get totally, totally wrong? And the answer is no. Actually, it's a question of law as to whether impeachment evidence can form the basis for a grant of a new trial, and the rule is no. And so that's, as I see the case, the core pivot point on whether Judge Cannelli abused his discretion, not the fight about whether there was a secret deal. Well, and I guess that question then presumes that we accept his factual finding that there was a secret deal, and then we ask, as a legal matter, if a district court presides over a trial at which there was a secret deal to the key witness that went to the heart of the entire case, if that district court abuses his discretion by saying, you know what, I'm not going to let him get away with this. I'm going to have a new trial. And that is a legal question. It depends on how to characterize the evidence. Correct. It's not substantive evidence. It's really classic impeachment evidence. It doesn't serve any other purpose. Your Honor, if you bribe a witness, that's impeachment. Because, hey, you testified that because I gave you a million dollars. But that does corrupt the truth-seeking function, and it is within the district court's discretion to say I believe the jury would have seen it differently. And, Your Honor, Judge Cannelli... It's a question about whether the judge abused his discretion at that step of the legal analysis. It's whether this fits within the legal rule that impeachment evidence doesn't qualify for a grant of new trial. Shooting ahead to the impeachment question, I dispute the proposition that something that is impeachment can never support a new trial. Obviously, all Rule 60 motions involve evidence, some of which can be characterizing as having some impeachment value. But the law is very clear. The Taglia case is right on point. The Salem case... Taglia is a criminal case. Well... It's not a civil case. And the criminal rule, new trial rule, has the interest of justice element to it that the civil rule does not. And the equities are very different in a criminal case versus a civil case. Well, the equities are if somebody is bribing witnesses, then there should be remedy for a new trial. That is parallel in both contexts. As far as the proposition that something that has an impeachment quality can never be a Rule 60, the Taglia case, the Salem case... It's not just whether it has an impeachment quality. It's how to classify the evidence. And this was impeachment evidence. It's clearly not transactional evidence as part of the underlying constitutional violation. It's purely impeachment. And the question is whether we should create an exception to the general rule that impeachment evidence doesn't qualify for a new trial grant for cases where the impeachment evidence is really bad. That's basically the argument. If we accept the proposition that the district court found essentially that there was a secret, undisclosed deal to reward a witness, it could have been money. In this case it was 11 years. To argue that that is impeachment of a quality that can't support a new trial would be, to me, an extension of the law that is unwarranted. The law is very clear that it's not a per se rule that impeachment can never justify a new trial. It's dicta. The cases are dicta. If it's merely cumulative or merely impeachment, then of course, ordinarily that wouldn't justify a new trial. But even the cases they rely on, the Cherminsky case, they go ahead and analyze would the evidence have been of this sort that would sway the jury. In this case, Judge Cannelli, undisputed, says I think it is of a character that would sway the jury. And, Your Honor, that is a finding that deserves deference. Judge Cannelli was at this trial three times. You don't have to read the 5,000 pages of transcripts. Judge Cannelli said, I sat through that second trial and I watched Earl Hawkins pretend to be a disinterested witness. And I observed his demeanor. And when I found out, wait a minute, when they were saying he was going to be in prison, that he didn't have a dog in the fight, and that they should believe his testimony, that Nate was a bad guy, I viewed the evidence very differently when I found out that they were lying that there was no deal. It wasn't an abuse of discretion to say, you know what, the jury might have looked at it differently too. I don't disagree with you on that point, but that's not, as I said, at least as I read the case, the pivot point here, which is the legal question about how to classify the evidence and if it falls within the rule. Our brief dealt with this extensively, and I think make a very persuasive case that there is no per se rule that if something is impeachment, it can never justify a new trial. That's what the cases say, that evidence is merely impeachment or cumulative. That is not a basis. It's a categorical question, how to classify the evidence. The common law recognizes this rule, and Rule 60B incorporates the common law as the cases have said, and unless we carve out an exception, that's the rule, the legal rule. I disagree. Our case law that we've cited in our brief say ordinarily impeachment doesn't qualify, but it is not a per se rule. I don't think you have to carve out or make any exception at all, and we laid out all of the cases, go on to analyze. What's your best case? The Taglia case is right on point. Taglia is a criminal case, and its reference to 60B is complete dicta, so there's no holding there for you. Your Honor, there is no holding anywhere that if it's impeachment, it can't support a new trial. That's the point we make. It's overly formulaic. There's language that gets cited over and over. If it's merely accumulative and impeaching, it's not enough for it to narrow. All the Rule 60 cases, including the cases they cite, go ahead and analyze whether it is material. The Salem case says exactly what I just said. In just a couple of sentences, what your proposed rule is for how to decide Rule 60B motions that are based on impeachment evidence. Exactly what the law is, which is Rule 60 motions are unusual. It's got to be extraordinary evidence. Ordinarily, if it's cumulative or impeaching, if you find something new that's impeaching, ordinarily that's not going to work. But, if the district court judge says, I am intimately familiar with the case, and this evidence was of such a powerful nature that the jury would have looked at it differently, then it can support it even if it has an impeachment quality. If you bribe a witness, for example, that qualifies. That's not an extension of the law. We did brief it extensively. I urge you to go back. The Salem case specifically says, ordinarily impeachment is not enough, but sometimes it can be. Fraud on the court. That's another good point, Your Honor. B2 is not the only Rule 60 in play here. There is B3, which is misconduct and fraud, and this clearly goes through that door as well, as well as the B6 Exception 2. It would be overly formulaic to say, all right, we have a case where a witness was bribed, and that concerns us. And the district court says, I was there, I saw that the jury would see this very differently if they knew that this witness was not the disinterested witness he said he was. That district court has the power to say, in my view, the jury could see it differently. And you know what's not to be surprised about, Your Honor? He was right. When they redid the trial, 2014 to 2016, same evidence, same claims, same everything, the jury in both trials found that Nate's rights had been violated. But the second time, when they heard, wait a minute, you're saying Nate's this El Rukin killer, El Rukin, El Rukin, murders, murders, murders. The guys who were saying that had to be bribed to give that testimony. Then the jury said, you know what, we accept the plaintiff's trials is not involved in that criminality, and they awarded $22 million. If they believed Earl Hawkins that Nate was involved in all these things they're urging you to believe he was involved in, then they wouldn't have given that award. So it's almost like a controlled experiment. The 2014 trial, Hawkins testified, I'm disinterested. The 2016 trial, same testimony, but this time we impeached him with, they had to get you out of prison to give that testimony. Nobody believed him, and it did make a difference. That's what Rule 60b is, a secret witness. It shouldn't trouble your honor that if they're bribing witnesses... Well, a bribe is fraud on the court, bribing a witness. So that would fall under a different subsection of Rule 60b. This is the catch-all, which is subject to the rule that makes certain categories of evidence just unavailable for this kind of relief. Are we really going to have to agree or disagree? Because you're the judge, I'm just the arguer, but the law never says it is categorical. If it's impeachment, it cannot be Rule 60b. Our discussion in our brief is very clear. Ordinarily, don't come to us after trial and say, hey, we found some new impeachment. But all the cases go ahead to proceed to analyze whether that impeachment evidence is of such a character that it could sway a jury. So some impeachment could be so serious that it does qualify. But the common law rule traces back to the Southern case, which, granted, is old, but it's still valid and good law from the Supreme Court that does treat this categorically. Your Honor, the Southern case from the 1800s involved bribery and said, I can't grant a new trial based on bribery. But as we pointed out in our brief, that was before the federal rules existed. That was before Rule 60. And they say that's still good law. I can't give a new trial if we find out we bribed all the witnesses. That's not still the law because Congress has amended it by statute and said, if there is newly discovered evidence of such a character that causes doubt, then you can grant a new trial. So Southern is not good law at that point, for good reason. We can't have witnesses being bribed. And Your Honor took a little umbrage with characterization of not being bribed, but they made a secret deal with the witness. The witness got up there, pretended he was disinterested, said, Nate's a bad guy, involved in all our stuff. He walks off the stand, and they let him out of prison. It's a thing of value. Time in prison is a thing of value. For the person in prison. At trial, we said to him, hey, if they're going to give you 11 years to tell their story in tongue-in-cheek, we said, Earl, what if we give you 10 grand? Will you swing back to our side? And he said, no, time is much more important than money. But what that illustrates is how absurd this whole thing is. They're giving secret deals to witnesses. The, you know, Fields v. O'Callaghan should not be the case that says it's okay to give secret deals to witnesses, because formulaically that's only impeachment. It's not only impeachment. And I'll tell you what else, Your Honor. It also goes to other things that have nothing to do with impeachment, such as consciousness of guilt. We're going to call Mr. Hawkins at this trial. They know, they've already technically got him in a plea agreement. He's supposed to tell the truth. Why do they got to approach him and say, we'll get you out of prison 11 more years? That shows they knew if he came in and told the truth they'd have a problem. It goes to intent. It goes to malice. It's not only impeachment. It can't be put in, you know, they're wrong on both levels. It can't be put into this tiny little impeachment box. And the fact that it has an impeachment characteristic does not disqualify it as the kind of thing that could grant a new trial. They made an undisclosed deal with a witness. Your Honor, every Rule 60 case, you could say that whatever it was that was good enough, and it has to be unusual, but whatever it was is good enough, has some impeachment characteristic. Isn't their argument that it was disclosed? Well, that's because they're repainting what the it is, Your Honor. They did all these machinations to make him parole eligible. And as Judge Connelly said, that wasn't disclosed, because it's confusing. You read it, and they're saying, oh, we're just trying to make the federal run conterminous with the state. We're just trying to capture the intent. Judge Connelly said, I didn't appreciate the significance of it, but that's all a red herring. What they didn't disclose was that they made a deal. He gets off the witness stand, and they start writing letters saying, please let him out of prison. That wasn't disclosed. There's no due diligence issue. You can't do that. You can't make undisclosed deals with witnesses. That's what was undisclosed. Mr. Breyer's argument's irrelevant. He's talking about, well, we could read the restructured plea agreement. Judge Connelly said, I could read the restructured plea agreement, too. I didn't appreciate what you're saying, but that's not the point. The point is, we could read the restructured plea agreement, up, down, and every which way. It doesn't say that you're going to make secret deals with witnesses, that we will help get you out of prison by writing you these extraordinary letters. Letters in their entire career, they've never written another letter. They're trying to say that this was, I heard him say they had an understanding that they would write this letter. I don't know where that was ever disclosed, or what exactly they're saying about this secret deal, but they've never written a letter for another cooperator. They never wrote a letter for Earl Hawkins. He was up for parole multiple times before he testified to them, and Mr. Hogan, Mr. O'Callaghan, Mr. Brannigan, Mr. Sexton, in their careers, they've never written a letter like this. He testifies to them. Next thing you know, they're writing letters saying, please let him out of prison because of his extraordinary cooperation in this civil case. Can you clear up the confusion about 2016 versus 2027? 2028. Or 2028, whatever the outer date was. Everybody said, as Judge Connelly pointed out, he's getting out in 2027. That's when he's 72. So everybody's intent was he was originally supposed to be in for life, 72, 72. What I think the confusion is somebody misspoke on the 2016. They're talking about parole eligibility. It's really MR, isn't it? Mandatory release subject to this legal standard about whether you're likely to re-offend? No. First of all, it would have been only federal in that state, but it's a mandatory hearing. It's not mandatory parole. I see. All the parole records show we're not letting him out. He's not going to get out. He was only supposed to be in for life, then it went to 2027. So to answer your question, I think what he was talking about was eligibility for parole, not out. Sexton said, on the record, this is what really bothered Judge Connelly. He laid it out in his opinion. He said, hocus pocus, 5932, you know, we're changing it to make it terminus, but he's not getting out until 2027. And he cited Hogan's letter. He's not getting out until 2027. Now the defendants elicited in 2027, and then he argued in 2027. Yes, he was eligible. They played the games with the jail credits to make it so that he was eligible in 2016, but that doesn't get him parole. The missing piece is, oh, by the way, we're going to write extraordinary letters telling the parole permission, we law enforcement think this guy should walk. You can't withhold that. That is a corruption of the judicial system. Mr. Fields was railroaded the first time back in the criminal case in a very corrupt prosecution. And by the way, even the jury that thought he was guilty, that believed Earl Hawkins, that he was involved in all these things, they thought that Nate was railroaded. They found that his constitutional rights were violated. No serious dispute that his constitutional rights were violated. And then they're doing it again by making secret witness deals. It should offend this court. And then just to further clarify, the 2014 hearing was initially a discretionary hearing that got converted to the mandatory hearing that you've referred to because there was a miscalculation of his good time credit? Not because there was a miscalculation. Because Sexton inserted it into the restructured plea deal. And that's explained at some length in our brief. He didn't have the authority to do it, but the Bureau of Prisons wasn't a party. He played with the jail credits to make it so that that turned into a two-thirds hearing to speed up the time at which he would be eligible. We explain that really clearly in the brief. And Candace was at the deposition and she said, all right, you just explained a lot of stuff on the record. Are you changing anything? And he said, no, no, no. We're just clarifying the original intent. Are you changing? And they said, we're not going to write it down yet, but nope, we're just going to clean some things up, but it is still the intent that he's going to stay until 2027. And that's what bothered Judge Canelli. Judge Canelli said, I couldn't have figured that out, and I'm not blaming plaintiff's counsel, because it was hidden. Because, I mean, they were trying to mask what they were doing. Sexton went to the parole hearing in the state court and tried to pretend like it was a mistake and a misunderstanding. And it's very powerful, because he had written a letter. He knew exactly what was going on. Judge Canelli was very bothered by it, and as would any judge be. I want to double back to a couple of points. They're very important. Judge Canelli relied on post-events, and Judge Canelli was extremely clear that he was not relying on post-events. He said it explicitly in his order. He said, to be clear, on one point, however, the court did not base the grant of a new trial on, quote, the fact of Earl Hawkins' release, as defendants contend, in arguing it was inappropriate to grant a new trial based on events that occurred after the trial. The court did, however, look at post-trial developments as shedding light on the pre-trial events. It's a silly argument. He walks up to the witness stand, they give him a bag of money. He walks up to the witness stand, they let him out of prison. He didn't let him out because they let him out of prison. He didn't give a new trial because they let him out of prison. He said the fact that he had this extraordinary thing happen lets me infer that there was a pre-agreement. And, Your Honors, before we could say that Judge Canelli was just way off base to infer there was a real agreement, look at what happened. When we asked to do discovery after the trial when Earl walked out of prison, their post-trial motion response, 766 record number, they filed a response saying there is no evidence that there was any agreement to provide assistance to Hawkins. They opposed discovery, saying, hey, we knew exactly what the plaintiffs did. Any suggestion that there's a deal is way off base. And then Mr. Hogan opposed the subpoena, saying it's a wild allegation of a conspiracy, that there was some promise, some deal to Earl Hawkins. They opposed it. Judge Canelli said, you know what, I think I'm going to see the parole file anyways. And if he hadn't done this extraordinary thing, post-trial discovery, we never would have found out. Then we see those extraordinary letters where they went to bat for him and they got him released. So they lied about it. And Judge Canelli could certainly take that into account when he was trying to decide if there was a secret deal, that they tried to tell the court we don't know anything about what happened. And your honors, if there was any doubt at all, at the 2016 trial, Earl Hawkins got on the stand and said, you know what, there was a deal. I made a commitment to them to testify because they made a commitment to me. It's explained in our briefs. It's 2460 and 2470 and 2471. It was a very dramatic moment because we said, Earl, who did you, actually what happened was, he said, I told them, you've got to keep your commitment. That's how I got out of jail. They made a commitment to each other. So, in 2014, when Judge Canelli grants the new trial, there's all this argument about whether there was a secret deal or not. And Judge Canelli says, I don't believe you. I think there was. And then it turns out, at 2016, we took testimony and Earl Hawkins says, you know what, there was a deal. And we left it alone because that was good enough, but actually a juror asked a question. A juror said, when you just said there was a commitment, who did you make that commitment to? Who was that commitment with? In other words, we let it be. It was good enough for us. So a juror asked that question. So Judge Canelli poses it to Earl Hawkins. Hey, a juror wants to know, when you say you had a commitment to testify and there was a commitment coming back, who to? And he pointed, the same finger he once pointed at Earl and Nate, he pointed it at the defense table. And they tried to say he didn't, but it's, look at A65 in the appendix. Judge Canelli said, I saw it. I was there. He pointed at the defense table and there's a question answer. I made that deal with the defendant. So Judge Canelli didn't get it wrong on inferring there was a secret deal that they're denying. Judge Canelli got it right. Earl Hawkins admitted it. So then you only get to Judge Seitz's question is, does it have significance? Is this court going to say, all right, a district court found there was a secret deal to pay the key witness in the case, the heart of the case. Earl Hawkins is the only thing they had going. Everything they want to say, Nate Fields was a bad group and gang, gang, gang, drug, drug, drug, involved in murders, murders, murders. It's Earl Hawkins saying it. And Judge Canelli said, I heard both trials. I heard the 2014 trial and I understood what happened. And then when I saw, when I learned that Earl Hawkins was not a disinterested witness, that there was a secret deal to pay him, I said, this is the kind of rare thing that justifies a new trial. And as I already mentioned, he was right. When we redid the trial and Earl, we were allowed to say, Earl, if your testimony is bought and paid for, they already had you in a plea deal. They had to give you 11 years. They had to let you walk out of prison to say it. Then the jury didn't believe him. That's what Rule 60 is all about. Your Honors, I want to cover a few more subjects, but first I want to say that we win regardless. And this point they ignored. O'Callaghan asked for this new trial. He asked for the new trial. Judge Canelli ordered a new trial on damages against O'Callaghan. He ordered a new trial against the other defendants, but O'Callaghan then had a choice. He could have done what you're supposed to do, is go through the trial on damages and then go up to the appellate court and appeal. O'Callaghan said, no, Judge, I want you to give me a new trial on liability. Why did that have significance? He had exposure. He lost the first trial. He was on the hook for $80,000 and millions of dollars in punitive damages. So he had a fork in the road. He had a choice. He said to Judge Canelli, I want a new trial on liability. He could have won that trial. If he had won that trial, then there would be no liability. He wouldn't have owed him $80,000. He wouldn't have owed him millions of dollars in attorney's fees. He asked for the new trial, and he didn't win. He lost, and he lost bigger. But a party that chooses a road can't appeal it, and that beats him independently. I want to talk about Mr. Coleman's arguments as well. There's just a major, major, major misunderstanding that they're trying to perpetuate. They're saying, oh, you know, Nate Fields was able to say he's a good guy who's not involved in the gang hierarchy, who is a small fish in the big pond, and it was so unfair to us. Let me be really clear. Nate Fields did say that at trial. I am not involved in the criminality. I am a good guy. I am a building manager. Judge Connelly said, doors open, guys. He just said that. If you have any evidence otherwise, have at it. They took their best shot. If they had any evidence at all, they were allowed to put it in. They weren't restricted in putting in evidence. If they had evidence that he was involved in narcotics or murders or assassinations, they were allowed to put it in without restriction. Earl Hawkins got on the stand. Granted, this time we were able to say his testimony was pursuant to a deal, but he said assassinations, murders, four murders, gang hierarchy. Nate Fields had taken orders from Jeff Ford. It's not that Judge Connelly sanitized this. There were no restrictions at all, and he really quickly tried to go through the four restrictions. They weren't restrictions. The wire trap evidence. He tried to run through them quickly. Let's take them one at a time, what they're saying they were barred from putting in. The wire tap evidence. First of all, the wire taps were good for the plaintiff. There were hundreds of hours of uninhibited talk with El Rukns talking about murders, crimes, and terrible things. Nate Fields isn't on any of it. So all these El Rukns are talking about terrible El Rukn things. Nate Fields is not on it. Those wire taps were good for us. They tried to get in one piece of the wire tap where a guy named Knox alleged, according to a guy named Trammell, translating the wire tap, a guy named Knox told Ford that Knox heard from Hawkins that Hawkins told Fields about the bribe. That's the one thing on the wire tap they say they were excluded from getting in. That's got so many levels of hearsay, you can't even count it. But the real problem is, who cares? Hawkins got on the witness stand and said, I told Fields about the bribe. So what additional probative value that Knox heard from Hawkins told Ford, that's the best argument they got? Given the significant evidence attacking Hawkins' credibility, wouldn't evidence as to Mr. Fields' knowledge of the bribe from another source have been important to the defendant? Well, I mean, they got it. Hawkins said, I told him, and this evidence would have been Knox heard from Hawkins and told Ford. So does it add an incremental little bit? But to what? So he told them about the bribe. What really, you know, it's a side issue. It's got nothing to do with the case. Somebody told Fields about the bribe. Both Illinois courts said the evidence is irrelevant. So Judge Connelly wouldn't have abused his discretion to keep it out. You know, three courts said it's not even relevant at all. The other issue he mentioned was this murder when Fields was 17. To be clear, that was an accountability theory. A boy shot a boy at a party that had nothing, you know, Nate didn't kill anybody. Okay? It came in that Nate was convicted of a serious crime. It came in that he served time in prison. It came in that he made a false alibi. Judge Connelly said the incremental damage of saying the name of the crime doesn't, it's a routine Rule 403 discretion. But the real point is it's got nothing to do with the El Rucan. See, even now, he's trying to fudge that it's an El Rucan. It had nothing to do with the El Rucan. It was in Robbins. It was not a, you know, they tried to say that he reinvented his life story. He was in a gang. Some kids are in gangs. Actually, it's not uncommon at all in Chicago. In some neighborhoods, if you're in a neighborhood, you're in a gang. It had nothing to do with the El Rucan. These are teenagers in Robbins. He didn't join the El Rucan until he got to prison. And in the 70s and the 80s, everybody in prison was in a gang. He had to join a gang to survive. He joined a gang to survive and he survived. But he got out and he led his life law-abidingly and he did manage a building. And Judge Connelly said, if you got any evidence otherwise, bring it on. And they brought it on. You know, Keys, Hawkins, these guys who got these deals, they testified, oh, you know, Fields has murdered all these people. Fields wanted to join my assassination team. I saw Fields with guns. Fields was murdering people. Jeff Ford's giving Fields orders. They didn't sanitize anything. The problem was, the evidence wasn't credible the second time. It was credible the first time when Hawkins told that story and said, I got no dog in this fight. I don't even have to be here. Hawkins said, I'm just telling it like it is. You know, Fields was running with us and they had to let Hawkins out of prison to tell this story. And, you know, the elephant in the room is they really want you to believe that Fields is a bad guy. It's almost like they're asking for judicial nullification. They know that their evidentiary issues aren't going anywhere and they know that this court is not likely to intervene to say, if you're going to make secret deals with  about it. What about the Morris case? The Morris case? Your Honor, Judge Connelly said to him, You want to introduce Morris' out of court testimony. Pure hearsay. If you do that, then I'm going to let plaintiff on straight Rule 806 application, I'm going to let plaintiff put in these affidavits. They said, we're doing it with our eye open. We understand the choice. We're going to put in his testimony. So they put in his hearsay testimony. Rule 806 says, we put in the affidavits. Then they relied on different Mr. Colwin reserved the right in his brief, this is in our brief, to rely on the affidavits, on a different affidavit from Morris. And then they made arguments of their own about the affidavits. Then Mr. Colwin gets up and closes the argument and says to the jury, Find those affidavits. Look at them. Read them. That's not a new trial, Your Honor. I mean, that's not a new trial. If anything, the weakness of their argument should be telling to you. This is a four week trial, 5,000 pages of transcript. These are the best arguments they got because Judge Conelli did not give them an unfair verdict. What was the other evidence of fabrication? Of fabrication? That the criminal trial evidence was fabricated. It didn't just depend on these dueling affidavits, did it? No, this was the side issue. The issue was Langston and the file suppression, the suppression of the street. The Morris issue was really neither here nor there. The prison logs and the prison visits, we've covered this in our brief. The stalking arrests, you know, this is an arrest. Arrests don't lead to convictions that aren't admissible. There was no evidence. There was no stalking arrests with a TEC-9 in El Ruben. There was no police report. It didn't exist. Judge Conelli didn't abuse discretion. So Judge Conelli said if he got any evidence at all that he's doing all these terrible, terrible things, got any evidence that he was a building manager that was involved in narcotics and guns and murders, put it in. The problem wasn't that Judge Conelli didn't let him put it in. The problem was there wasn't it. There wasn't any evidence. They were able to put it in whatever they wanted. The five things they've identified are super telling just how hollow it is that in four weeks of trial, this is what they got. You know, this is not a reason to go back and do a fourth trial. This is a case that Judge Conelli saw three times. He understood the issues. I mean, ordinarily you defer to a trial court's discretion as it is. But this is a case where he had seen the second time and then by the third time he said, you know what, I know how the Morris movie plays. I've seen this movie. And he made very careful rulings. He did not make any mistakes. Certainly didn't make any mistakes to adjust by a fourth trial. And the weakness of their arguments is telling. The only issue is whether this court wants to get involved where Judge Conelli said, I think there was a secret deal to pay witnesses and I think the jury would have looked at the evidence very differently because I would have. And he wasn't wrong about either count. This is not a case where this court should do anything to deserve that. It's a very deferential standard of view and this court should defer. Thank you. Thank you very much. We went over by a minute and a half, so please add two minutes for Mr. Byer. Thank you. Why don't you make it a full three? I'll take whatever you're willing to give me, Your Honor. Thank you for your... Stay here all day. My family might be upset about that, but my client might prefer it, so I guess that wins. If I may, Southern is the response to virtually everything that opposing counsel had to say here today. The idea that no case is held, that impeachment, that the rule against impeachment evidence is a rule, that's Southern. Southern calls it a rule. No exceptions. They actually warn against exceptions. Say, litigation... I'm paraphrasing. Of course, litigation would go on forever and also that opposing litigants would have a strong incentive to tamper with witnesses. That was exactly what was at issue in Southern, and they said outright it was a holding. It was not dicta. It was not just a throwaway language. It was a holding. It was a rule that impeachment is never a basis for a new trial, and that is precisely what Mr. Fields offered here. That is exactly how he described it in his motion, and even in his argument here today, Mr. Fields again calls it impeachment evidence. Maybe that was a slip of the tongue, but it's a telling slip of the tongue. This was impeachment, and the notion that bribery is exempt from that rule, Southern involved bribery, bribery of a material witness. There was no way around the rule of Southern that there was a rule against impeachment evidence as a basis for a new trial, and Southern resolves this case outright. And turning to this notion that because Southern predated Rule 60b-2 that it can just be disregarded, the Supreme Court has made quite clear it disagrees with that understanding of the rules of civil procedure altogether. That's the Hall case recently decided in the past couple of years that our rules are meant to incorporate pre-existing precedent, and if we meant to change things, we would have been told ourselves, and we would have told you. There's nothing in Rule 60 that says anything about unsettling pre-existing law. To the contrary, the drafters of the rule made quite clear, and we cite a mountain of treatises and cases and on and on that say Rule 60b-2 was meant to preserve the power that existed at the time, not to enlarge it, not to subtract from it. And that's Southern. Southern is binding here, Southern is controlling here, and Southern requires that the new trial order be set aside. If it's a rule that incorporates the common law, the common law is flexible. The common law might have been. Judicial policy, right? The point that's being made is that to elevate form over substance here and exclude this evidence as a basis for a new trial grant corrupts the system. That doesn't deserve any weight? Well, there's actually a safety valve that's a Rule 60b-3, but the problem is that, as Your Honor observed, there's 60b-3, there's also 60b-6 when you have fraud or fraud on the court. But the problem is those rules have their own specific procedural safeguards to prevent them from just being thrown around willy-nilly. Particularly, and there has been zero explanation here how Mr. Fields could possibly, this is in his motion and in his brief and today, there has been no explanation how he can get past the fraud has to be shown by clearing convincing evidence, and it must be shown that the fraud prevented you from fairly presenting your case. Well, right. That's if this were being litigated as a fraud on the court. A b-3, it's not. It's a b-2. We believe that ship has sailed on that notion. This was presented as a 60b-2, and Judge Connelly understood it as a 60b-2. That was specifically addressed when describing, he had a bit of difficulty understanding because Mr. Fields' motion was so undeveloped, but at the end he said this is a motion for newly discovered. Right, but so to my point, that the common law is based on judicial policy and experience and the norms of the system and if the rule operates categorically to exclude evidence of this gravity is putting aside the fight about whether there was a secret deal then the policy underlying the rule is, there's a disconnect between the policy underlying the rule and the application of the rule in this case which suggests the need for some flexibility. Whatever need for flexibility there might be we believe is one, handled by the existence of Rule 60b-3 and 60b-6, and second is to the extent that there is going to be an exception, the Supreme Court said no. The Supreme Court said do not make exceptions to our rule. We have concerns this will drag out litigation endlessly, and five years after their trial... That's a pretty aggressive reading of Southern from 1858 or 1853 or whatever it was. You know, to avoid the, you know, there would be scarcely an end to litigation absent the rule against impeachment, and it would hold out in the Senate. Common law rules are mislashed all the time, like common law courts. I would respectfully submit that this court would not be able to, is not in the proper position to craft exceptions to Supreme Court rules. This court has actually chastised litigants like myself repeatedly for trying to finagle exceptions into rules that the Supreme Court set forth, that if the Supreme Court thought something should be clarified, that's for them. If a cert petition is filed, the Supreme Court is in a position to say, we think that's an overstatement and we want to step back, but that issue just simply isn't here today. Okay. My apologies, just to correct a couple of misrepresentations before I sit. Mr. Fields' claim that Mr. Hawkins stated a trial by dramatically gesturing at counsel, claiming that there was actually a deal with the city of Chicago or the police officers, transferred page 2470 of the second trial. When asked what he meant, he simply said the state and federal government. Mr. Fields attempted to get a more satisfactory answer, and the objections that sustained him, as expected, asked an answer. Moreover, this idea that Sexton was massaging jail time in order to manipulate federal parole, that's simply outside Sexton's authority. He's a state prosecutor. He can't grant Mr. Hawkins federal jail time. This court has stated that federal prosecutors don't have that power to divide a government, as one would expect. Also, you have the July 11, 2014 Bureau of Prisons documentation, which is in the record at 1282-2 that specifically says that the jail time was granted as quote, part of the overt act. This was because, again, Hawkins was being tried on a RICO charge, and as a matter of federal law, he was entitled to jail time on his conviction on the underlying offenses. So this idea that Sexton was massaging things, and also, if Sexton was doing this, it was on the face of the 2013 agreement. This wasn't secret. It was right there, so Fields had that in his possession. Also, the notion that O'Callaghan waived anything by moving to reconsider, that argument's frivolous. I'm sorry. Mr. O'Callaghan specifically moved for a new trial liability if the court believed that a new trial was necessary at all. This court has been quite clear that you don't have to remonstrate. You don't have to be stubborn. You can make the best of what you have. What Mr. O'Callaghan had was an order that wrongly granted a new trial, and he waived nothing by trying to make the best of it that he could. If he's going to be retried on damages, get retried on liability. It was a purely conditional request. Mr. Potters, this has gone five minutes more than I gave you, and I'm going to have to end it, and I'm going to give Mr. Luffy a chance to sir reply. I'm sorry. I believe I had nine minutes? Well, you had used it.  seconds left. I apologize. I did not realize that. The new system. The light misled me. I apologize for the interruption. No, don't apologize. The new system. But I will allow Mr. Yes. I haven't forgotten you. Finally, I'll just request that you vacate the order for a new trial. Thank you. I really hate being a timekeeper. To respond to Mr. Moby's points, Mr. Moby talks about watching a movie, and I watched the same movie, and it wasn't anything like he described. There was no allowance for us to rebut any of the peaceful El Rukin arguments and testimony that Mr. Fields presented at the trial. We were barred from introducing into evidence evidence that came in in the 2014 trial, but that was barred from 2016 that Derek Tease testified that on a mission to stalk and kill Tradesse Murray of the King Cobra's gang, that Tease saw Fields get arrested with a submachine gun. That evidence was barred. It was just a couple weeks before our arrest. He wasn't just a landlord, but we couldn't get that evidence in. Mr. Moby says there's no documentation of that. There is. It's at record 1182-6. It's the report that identifies that Mr. Fields was caught with a 9mm interdynamic Luger with 29 live rounds. Mr. Fields admits that he was arrested at that time in the possession with a gun, and so that's corroborated. The wire taps, there was corroboration for that too, because after the bribe was passed and Mr. Swano comes back to over at the Fort, the El Rukn Fort, he comes back and talks to Hawkins, the money's passed, and then the jury is waived. Hawkins waives the jury. Next thing that happens, Mr. Fields waives the jury. The notion One more point, then I have to. The last point, thank you very much, Judge, is that the notion that Earl Hawkins' testimony about Fields' knowledge of the bribe is deficient is inconsistent with their position that Earl Hawkins lacks credibility. The wire taps would have been the tiebreaker. Thank you, Your Honor. Thank you. Mr. Cole. I can name that too in less than 30 seconds. Your Honor, two points. First, you asked Mr., I believe Judge Sykes asked Mr. Alovey, is there any other evidence of direct fabrication by Mr. O'Callaghan? The answer to that is no. If Mr. Alovey had any, he would have told you. The answer to that is no. What about the Langston case? The Langston was in the actual trial, the underlying trial, and that was on materiality, but this was testimony that Mr. O'Callaghan after that trial was long over, not once, not twice, but repeatedly over 20 years threatened Morris with bribery, intimidation, but Morris testified he was scared to this day. Direct evidence and that is extremely powerful, and it is ironic. It is beyond ironic that Mr. Alovey says that you should be outraged by this case because of this secret deal. What secret deal did Gerald Morris get? I don't know. I couldn't oppose it. What secret deal when the plaintiff's investigator went down there and interviewed him in secret, did he promise him? I don't know, nor do you, nor did anyone. What secret deal did he get to come and say and recant sworn testimony that he had given? Sworn testimony. He had never testified under oath to this. It was only when he went to the plaintiff's investigator and then all of a sudden Mr. Morris was represented by a lawyer from Chicago. How did that happen? How did it happen that this lawyer from Chicago is suddenly representing him down in Missouri and files a motion for a protective order so that the defendants can't talk to him anymore? Now come on. You want to be outraged by something? Be outraged by that. This was a key piece of evidence. This was a bell ringer, and no defendant should be confronted with it. I was there. I tried to cross-examine. Try cross-examining an affidavit someday. I'll tell you, Judge, I've been doing this for 40 years. That's a push. This case should be reversed. Thank you, Your Honor. Thank you. Come on up, Mr. Levine. Because of all the extra time that was given. Oh, you did. You went way over your time. Oh, you did. You did too, my dear. And that's unappealable. Go ahead, Mr. Levine. You know, the one thing everybody agrees on is that there's just two versions. They're saying he's El Rukin, El Rukin, El Rukin, murderer, murderer, murderer, and we're saying actually, no, he's a really nice guy. Yeah, well, there are 5,000 pages that we're going to be reading. Well, we had a jury, and the jury heard four weeks of El Rukin, El Rukin, terrible, terrible guy, and the jury said, you know what? I don't think so. They awarded him $22 million once they found out that Hawkins had a motive to say what he was saying. So you don't have to decide that. That's not before you. I would urge you to keep in mind they're almost inviting nullification. They just want to argue in their brief over and over again that he's a bad guy, he's not a bad guy. On the law, on the law, this should not be the court that says we're going to let people give witness deals and get away with it, and they've identified nothing that could justify an evidentiary error. Just really briefly on the evidentiary errors, they're talking about that stalking arrest by the CPD. Derek Keyes got to court and said, you're going to let me out of prison, and I'll tell you, I remember Fields getting arrested by the CPD with a Checkmate machine gun. Everybody looked in the CPD arrest, no such report. It didn't happen. It didn't happen. He's making it up. If there was a police report, that would have been something different. So they're saying that they got restricted from bringing in evidence. They didn't get restricted. They got to tell their story. The jury didn't believe them. On the 60B issue, the motion was 60B. She didn't designate 60B 2 or 3 or 6. This court could uphold them on any of them. Your Honor's common law point is well taken, but it could be independently justified on 60B 3 or 60B 6. It also doesn't have to be impeachment because they ignore that it goes to consciousness of guilt and that it goes to intent. So even if you get stuck in the impeachment trap, it had other admissible purposes they don't deny. This verdict should be affirmed. Thank you. Thank you. Thank you, everyone. The case will be taken under advisement.